**In re GUTERL SPECIAL STEEL CORPORATION; Guterl Steel Corp., Debtors.**

**GUTERL SPECIAL STEEL CORPORATION and Guterl Steel Corp., Stanley G. Makoroff, Trustee for the Estates of Guterl Special Steel Corporation and Guterl Steel Corp., Movants,**

**v.**

**ECONOMIC DEVELOPMENT ADMINISTRATION; Allegheny Ludlum Corp.; United States Trustee; United Steelworkers of America; the School District of Lockport, New York; County of Niagara, New York; City of Lockport Corporation; Environmental Division, New York State Dept. of Law in charge of enforcement of State of New York; State of New York, Dept. of Environmental Conservation in charge of enforcement of State of New York; State of New York, Dept. of Taxation and Finance; United States of America, Environmental Protection Agency; United States of America, Nuclear Regulatory Commission, Respondents.**

Bankruptcy Nos. 82–22590–BM, 82–22591–BM and 82–22590–BM.

Motion No. 96–0649M.

United States Bankruptcy Court, W.D. Pennsylvania.

July 1, 1996.

Robert G. Sable, Stanley G. Makoroff, Trustee, Sable, Makoroff & Gusky, P.C., Pittsburgh, PA, for Chapter 7 Trustee.

Frederick W. Thieman, United States Attorney, Albert W. Schollaert, Assistant United States Attorney, Western District of Pennsylvania, Pittsburgh, PA, for Economic Development Administration and Farmers Home Administration (EDA) and Environmental Protection Agency.

Gregory A. Jaffe, Environmental Enforcement Section, Environment and Natural Resources Div., U.S. Department of Justice, Washington, DC.

John L. Laubach, Jr., Pittsburgh, PA, for Debtor.

James J. Keightley, General Counsel, Jeffrey B. Cohen, Deputy General Counsel, Pension Benefit Guaranty Corporation, Office of the General Counsel, Washington, DC.

Joel M. Gross, U.S. Environmental Protection Agency, New York City.

Dennis C. Vacco, Attorney General of the State of New York, Maureen F. Leary, Assistant Attorney General, Environmental Protection Bureau, New York State Department of Law, Albany, NY.

George M. Cheever, Kirkpatrick & Lockhart, Pittsburgh, PA, for Respondent Allegheny Ludlum Corp.

Kathleen Robb, Office of United States Trustee, Pittsburgh, PA.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Chief Judge.

The chapter 7 trustee has submitted an omnibus motion wherein he seeks authorization to abandon real property, to distribute funds remaining in the bankruptcy estate, and to close the case.

United States of America Economic Development Administration (hereinafter "EDA") and New York State Department of Environmental Conservation (hereinafter "NYSDEC") oppose the trustee's request to abandon the property because it is seriously contaminated with chemical and radioactive waste.

NYSDEC has brought a cross-motion wherein it seeks an order directing the trustee to commence cleaning up the site. It further asserts that funds remaining in the bankruptcy estate should be utilized to pay for the remediation and that, if necessary, EDA, *inter alia*, should disgorge funds it previously received from the trustee when an uncontaminated portion of the property which was subject to EDA's lien was sold to a third party.

The trustee *now* concedes that abandonment is not permissible and that the site must be cleaned up before he can abandon it. EDA *now* concedes that remaining bankruptcy estate funds, including those subject to its lien, may be utilized to pay for cleaning up the site. It balks, however, at the contention that it should disgorge funds it previously received from the sale of the uncontaminated portion of the property to a third party in the event the funds remaining in the bankruptcy estate are insufficient to pay for the clean up.

The trustee's omnibus motion to abandon, to distribute remaining estate funds, and to close the case shall be denied. Funds remaining in the estate shall be used to pay for remediation of the site. The United States of America, Environmental Protection Agency ("EPA"), which has recently appeared and participated in this proceeding, will be ordered to pursue remediation, including phases I and II and thereafter if EPA deems it appropriate, should submit an administrative claim for reimbursement of the reasonable costs associated with its activities.

### FACTS

Guterl Special Steel Corporation and Guterl Steel Corporation (hereinafter referred to collectively as "debtor") filed voluntary chapter 11 petitions on August 20, 1982. Their cases eventually were substantively consolidated.

Debtor's primary asset consisted of real property, machinery, and equipment located in Lockport, New York. A substantial portion of the property was contaminated with radioactive waste when a predecessor of debtor did work for the Manhattan Project during the 1940s.

The above property was subject to a first mortgage and security interest in favor of Marine Midland Bank. As of September of 1983, the amount of this particular debt was $8,489,263.05. The property also was subject to a second mortgage and security interest in favor of Southern Investors Mortgage Company. The amount of this obligation as of September of 1983 was $4,713,163.00. EDA and Farmers' Home Administration (hereinafter "FHA"), both of which are agencies of the United States of America, guaranteed repayment of these respective obligations.

Marine Midland and Southern Investors eventually assigned their secured claims to EDA and FHA, respectively. In addition to appearing on its own behalf, EDA has acted in this case as the agent for FHA, Marine Midland, and Southern Investors.

Allegheny Ludlum Corporation (hereinafter "AL") agreed on March 27, 1984, to purchase debtor's real and personal property for the sum of $9,517,000.00. AL apparently was unaware at the time that a portion of the property was contaminated by radioactive wastes. Upon learning of the contamination, AL refused to close on the sale. Extensive negotiations eventually resulted in an agreement whereby AL purchased only the uncontaminated portion of the property for the sum of $9,517,000.00. Debtor retained title to the contaminated portion.

A chapter 11 trustee was appointed on May 30, 1984, to consummate the sale on behalf of the bankruptcy estate because all of debtor's officers had resigned before the closing could take place. The sum of $8,758,-962.06 was distributed to EDA from the net sale proceeds after the closing occurred.[1]

After the cases had languished for nearly three years with little or no progress being made, we entered an order on February 25, 1987, directing the trustee to deposit all estate funds still under his control into the court's registry account. A total of $1,381,-560.21 presently remains in the court's registry account for distribution to creditors. All but $55,078.22 of this amount is subject to EDA's first priority lien.

The above cases were converted to chapter 7 proceedings on June 26, 1990, when it finally became obvious that plan confirmation was not likely. The chapter 11 trustee was appointed shortly thereafter as chapter 7 trustee.

Due to chemical and radioactive contamination, the trustee is unable to sell the remaining portion of debtor's property. With the court's approval, and over the objection of the EDA, the trustee retained an environmental consultant to determine whether the property could be remediated and then sold. On September 15, 1992, the consultant reported that the site was contaminated with both chemical and radioactive wastes and that the extent of the contamination was greater than was anticipated.

Except for periodic requests by the trustee to release funds from the court's registry account to pay for his bond premium or to erect a fence around the affected area, the cases continued at the same languid pace that had characterized them for several years. In response to prodding by the court, the trustee requested permission to retain an environmental consultant to conduct a preliminary study of the contaminated site to estimate how much remediation would cost. The trustee proposed paying for the study with estate funds that are subject to the lien of EDA. EDA vigorously objected to the use of its funds to pay for the study. The trustee's request was granted in an order issued on June 8, 1995. EDA promptly appealed the order to the district court, which stayed the order. On November 7, 1995, the district court remanded the matter back to

---

1. Distribution of the above funds occurred prior to assignment of these cases to this member of the court. The problems and disputes that have plagued these cases probably never would have arisen had the funds not been distributed when they were. Moreover, we suspect that these cases would have concluded long ago.

us for further findings of fact and conclusions of law.

A hearing on the remand was held on December 21, 1995, at which time EDA argued that the trustee should abandon the property pursuant to § 554 of the Bankruptcy Code and represented that it would assist the trustee in preparing such a motion. To our great dismay, several additional months passed with no further activity taking place. A status conference was held on March 11, 1996, wherein the trustee was directed to submit a motion disposing of the issues remaining in the case by no later than March 15, 1996, or be removed as trustee.

On March 15, 1996, the trustee submitted an omnibus motion to abandon the property, to distribute funds remaining in the bankruptcy estate, and to close the case. NYSDEC, among others, opposed the trustee's motion on various grounds. Curiously, EDA reversed itself 180 degrees and joined in the opposition to abandonment. In particular, NYSDEC, with the concurrence of EDA and others, argued that abandonment of the property was not permissible because it posed a danger to human health and safety.

NYSDEC (and now EDA) agrees that the undistributed funds remaining in the bankruptcy estate, whether liened or unencumbered, should be utilized to pay the costs incurred in remediating the site. They disagree, however, as to what to do if the cost of remediation exceeds the amount remaining in the bankruptcy estate. NYSDEC asserts in its cross-motion that EDA should be required, if necessary, to disgorge funds it received when AL purchased the uncontaminated portion of the property to pay for remediating the site. EDA has steadfastly resisted any suggestion that it be required to disgorge these funds.

A residential area is located approximately one-fourth of a mile to the south of the contaminated property. Agricultural land lies immediately to the north. AL owns the property surrounding the contaminated property and occupies a portion of one of the contaminated buildings located on the site. A fence divides the building into two sectors. It is not clear how many people are employed by AL at that location.

The buildings on debtor's portion of the property are in serious disrepair. Gaping holes in the roofs allow rain to fall on the contents of the buildings and on their dirt floors. A high percentage of the windows are broken and the doors are missing. Although a fence was placed around the perimeter of the contaminated property to keep out trespassers, there are indications that intruders have been on the site. Homeless people may inhabit the site. The buildings have been denuded of copper wiring and light fixtures. The walls have graffiti on them. Cat food cans litter the dirt floors. NYSDEC argues convincingly that all of the above enhance the spread of the contamination and the danger to the community.

EPA and NYSDEC conducted preliminary inspections of the contaminated property in April and May of 1996 and discovered more than two hundred drums and other containers scattered throughout the facility. Some of the drums and containers are so badly corroded that their contents have leaked onto the dirt floors. Other drums and containers are so swollen that they could rupture at any time. There are indications that some of the drums and containers were overturned intentionally, probably by vandals.

While some of the drums and containers have labels identifying their contents, many do not. Laboratory tests to identify the contents have not been completed. The drums and containers having labels on them indicate that they contain chemical compounds such as hydrochloric acid, hydrofluoric acid, sodium hydroxide, potassium hydroxide, trichlorotrifluoroethane, and quench oil.

These compounds are highly toxic to humans. Hydrochloric acid, hydrofluoric acid, and sodium hydroxide, for instance, are highly corrosive and can severely damage the eyes, the skin, and respiratory system. Trichlorotrifluoroethane is a cleaning solvent and refrigerant that can severely damage the eyes, nose, throat, and skin and can induce coma, cardiac arrhythmia, and cardiac arrest.

Some of the corroded and swollen drums containing sodium hydroxide are stacked in two layers. Should any of the lower drums collapse, the upper drums would topple over

and spill their contents onto the dirt floor. A twenty-thousand gallon above-ground storage tank containing hydrochloric acid is overflowing and its contents have pooled on the floor beneath it. Significant quantities of asbestos hang loosely from overhead pipes and are strewn throughout the buildings. An above-ground tank containing pickling acid has ruptured and leaked its contents onto the floor. Several compressed gas cylinders are present in one of the buildings. An explosion that might ignite nearby chemicals and disperse radioactive waste could occur if one of the tanks ruptures. Cannibalized electrical transformers containing polychlorinated biphenyls ("PCBs"), a potent carcinogen, are scattered about the property.

Radiological surveys undertaken by EPA and NYSDEC indicate radioactive emissions in one of the buildings that exceed background levels of radiation and are well in excess of generally recognized safe levels. Emissions exceed both state and federal guidelines and could be severely harmful to humans who are exposed to it for a sufficient length of time. Some of the radioactive contaminants have migrated elsewhere within the confines of the facility. In short, this site is an environmental nightmare.

EPA is expected in the very near future to approve a two-phase remediation of the site. During the first phase, the site will be stabilized; the chemical compounds will be further analyzed and identified; and all drums and containers holdings hazardous chemicals will be "repacked" and removed from the site. It is estimated that the first phase will take three or four months and will cost in the neighborhood of two hundred and fifty thousand dollars. The second phase, which will commence upon completion of the first, will focus primarily upon removal of the radioactive wastes. All contaminated objects will be decontaminated, if possible, or removed from the site and transported to a facility licensed to receive and store radioactive waste products. The estimated cost of phase two is not known.

EPA will seek to recover from a responsible party the cost of cleaning up the site after it completes the project.

An evidentiary hearing on the trustee's motion and the responses thereto, including the cross-motion of NYSDEC, was held on June 3, 1996. All parties wishing to participate were given an opportunity to offer evidence on the matters before the court.

## DISCUSSION

### I.) May The Trustee Abandon The Property?

 The trustee seeks to abandon the above site pursuant to 11 U.S.C. § 554(a), which provides as follows:

> After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

Despite the seemingly broad language of this provision, the trustee's abandonment power is subject to an important limitation. The trustee may not abandon property, even if it is burdensome to the estate and is of inconsequential value and benefit to the estate, if so doing would contravene state statutes or regulations that are reasonably calculated to protect public health and safety from identified hazards. *See Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 507, 106 S.Ct. 755, 762, 88 L.Ed.2d 859 (1986). Section 554(a), in other words, does not preempt or override state laws that reasonably strive to promote public health and safety by prohibiting the abandonment of estate property containing hazardous waste. *See Commonwealth of Pennsylvania Department of Environmental Resources v. Conroy (In re Conroy),* 24 F.3d 568, 569 (3d Cir.1994).

The scope of the holding in *Midlantic* perhaps should be qualified by the following remark, which occurs in a footnote:

> This exception to the abandonment power vested in the trustee by § 554 is a narrow one. It does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment. *The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health*

*or safety from imminent and identifiable harm.*

474 U.S. at 507 n. 9, 106 S.Ct. at 762 n. 9 (Emphasis added.)

The Supreme Court regrettably did not elaborate upon this statement. In particular, it is not certain whether the above serves as a qualification of the limitation upon abandonment or is merely a parenthetical statement. This lack of clarity has resulted in a divergence of opinion among lower courts.

Some courts, probably the majority, have allowed abandonment, regardless of state environmental laws and regulations, when no imminent and identifiable threat is posed to human health and safety. *See, e.g., In re L.F. Jennings Oil Co.,* 4 F.3d 887, 890 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994); *In re Smith–Douglass, Inc.,* 856 F.2d 12, 16 (4th Cir.1988); *In re H.F. Radandt, Inc.,* 160 B.R. 323, 328 (Bankr.W.D.Wis.1993); *In re Better–Brite Plating,* 105 B.R. 912, 917 (Bankr.E.D.Wis.1989), *vacated,* 136 B.R. 526 (Bankr.E.D.Wis.1990); *In re Purco, Inc.,* 76 B.R. 523, 532–33 (Bankr.W.D.Pa.1987).

Yet other courts have disallowed abandonment where a continuing violation of state environmental laws or regulations would occur, without regard for whether or not an imminent and identifiable threat is posed to human health and safety. *E.g., In re Wall Tube & Metal Products, Inc.,* 831 F.2d 118, 122 (6th Cir.1987); *In re Peerless Plating Co.,* 70 B.R. 943, 946–47 (Bankr.W.D.Mich. 1987); *In re Stevens,* 68 B.R. 774, 783–84 (Bankr.D.Me.1987); *In re Mowbray Engineering Co.,* 67 B.R. 34, 35 (Bankr.M.D.Ala. 1986).

The United States Court of Appeals for the Third Circuit apparently has not taken a side in this matter. Fortunately, we need not resolve this matter for ourselves. Abandonment is not permissible in this instance under either view. In addition to violating the environmental laws and regulations of New York State, abandonment also would pose a continuing and identifiable threat to public health and safety.

For instance, the above-described chemical substances and compounds discovered at the site in April and May of 1996 constitute "hazardous wastes". Any discarded material resulting from industrial activity qualifies as "waste". *See* N.Y. ECL § 27–0901.11 (McKinney 1984). Such waste is "hazardous" if, as a result of its chemical characteristics, it can cause or significantly contribute to an increase in mortality or in serious irreversible or incapacitating reversible illness. Such waste also is "hazardous" if it poses a substantial present or potential hazard to human health or the environment when improperly stored or disposed of. *See* N.Y. ECL § 27–0901.3 (McKinney 1984). The serious threat to human health and safety posed by the various discarded chemicals present at the site was described previously. As was indicated, human exposure to these compounds may result in serious illness and life-threatening conditions and can even result in death. The site could be characterized as a disaster waiting to happen.

"Disposal" includes the *abandonment,* discharge, deposit, injection, dumping, spilling, or leaking of any substance so that it (or any related constituent thereof) may enter the environment. It also includes thermal destruction of hazardous waste or burning such wastes to recover usable energy. *See* N.Y. ECL § 27–0901.2 (McKinney Supp.1995).

New York's ECL further provides that no person may dispose of any hazardous waste without first obtaining a permit from NYS-DEC. *See* N.Y. ECL § 27–0913.1. Disposal of hazardous waste without obtaining authorization from NYSDEC is not permissible. *See* N.Y. ECL § 27–0914.2 (McKinney 1984).

Abandonment of the above site by the trustee pursuant to § 554(a) of the Bankruptcy Code in this instance would violate ECL §§ 27–0913.1 and –0914.2 in that the trustee seeks to dispose of hazardous waste without first obtaining a permit from NYS-DEC and without seeking any authorization except that provided by § 554(a) of the Bankruptcy Code. As we indicated previously, § 554(a) does not preempt or override state laws pertaining to disposal of hazardous waste if these laws are designed to protect human health and safety. The trustee conceded at the evidentiary hearing that he may not abandon the site as he proposes because

so doing would violate New York's laws meant to protect public health and safety. Accordingly, the trustee's request for authorization to abandon the above site must be denied.

## II.) Who Should Pay To Clean Up The Site?

■ The trustee in this case is required to comply with applicable state laws while managing the property in his possession in the same manner as debtor would if it were still in possession thereof. *See* 28 U.S.C. § 959(b).[2]

As was previously indicated, the present situation at the site is in violation of ECL §§ 27–0913.1 and 27–0914.1. The trustee is in possession of and is disposing of hazardous waste without first obtaining a permit from NYSDEC and without authorization.

The trustee, EDA, and NYSDEC all agree that the chemical and radioactive contamination of the site must be remediated forthwith. EPA anticipates that in the very near future it will commence phase one of its project to decontaminate the site. It is estimated that this phase of the project will cost approximately two hundred and fifty thousand dollars. The cost of phase two of the project is not clear at this time.

We are not certain whether we have authority to *direct* EPA, which appeared voluntarily in this matter, to carry out its statutorily-mandated responsibility to clean up the site and to commence work on the project forthwith.[3] If we have such authority, we direct EPA to begin doing so before a large-scale catastrophe occurs. If we do not have such authority, we strongly urge EPA to do so. For all we know, serious injury already may have occurred to individuals who either previously worked at the site or trespassed on it since it was closed. If EPA does not begin cleaning up the site in the very near future, the trustee is directed to request authority from this court to begin the clean-up of the site. Cleaning up the site not only will help to alleviate a serious threat to public health and safety, it also will bring us a step closer to finally closing this case.

The issue that must be addressed at this point is whose funds shall be utilized to pay for cleaning up the chemical and radioactive contamination of the site.

As was previously indicated, a total of $1,381,560.21 presently remains in the court's registry account for distribution to creditors. All but approximately fifty-five thousand dollars of this amount is encumbered by EDA's first priority lien. The net proceeds of $8,758,962.06 realized from the sale to AL of the uncontaminated portion of debtor's property were distributed to EDA subsequent to consummation of the sale.

NYSDEC asserts in its cross-motion that all of the remaining funds in the court's registry account, including the funds that are subject to EDA's lien, should be utilized to pay for cleaning up the site. In the event these funds are not sufficient to pay for the clean up, NYSDEC continues, EDA should have to disgorge all (or a portion of) the funds it previously received when the uncontaminated portion of the property was sold to AL.

Surprisingly, EDA responded on the record at the conclusion of the evidentiary hearing on the trustee's omnibus motion that it had no objection to utilization of all or a portion of the remaining funds in the court's registry account to pay for cleaning up the site. Its objection is **now** only limited to directing it to disgorge all or a portion of the net sale proceeds it received previously. In the alternative, EDA appears to argue that if it must disgorge funds previously received, than all others in a similar situation (albeit in a markedly smaller percentage) should also disgorge funds previously received.

---

**2.** 28 U.S.C. § 959(b) provides in relevant part as follows:

.... [A] trustee ... shall manage and operate the property in his possession as such trustee ... according to the requirements of the valid laws of the state in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

**3.** We phrase this paragraph in the alternative so as to avoid a "turf" appeal over the issue and thereby avoid further delay.

Postpetition administrative expenses generally are chargeable only against unencumbered estate assets and may not be charged against encumbered assets. *See In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 76 (2d Cir.1984).

A common law exception to this general principle evolved when a debtor, debtor-in-possession, or trustee expended funds to protect or dispose of the collateral subject to that security interest. If the expenditure directly inured to the benefit of the secured creditor, the expender was permitted to recover its reasonable costs and expenses at the expense of the secured creditor. Recovery was based on the theory that the creditor for whose benefit the collateral was preserved or disposed of otherwise would be unjustly enriched at the expense of the expender. *See In re Visual Industries, Inc.*, 57 F.3d 321, 324–25 (3d Cir.1995).

This exception was codified at § 506 of the Bankruptcy Code, which provides in relevant part as follows:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c).

Like its common law predecessor, § 506(c) is grounded on the equitable principle that a secured creditor should not enjoy a windfall at the expense of the claimant. *Visual Industries*, 57 F.3d at 324–25.

Despite the wording of the statute, an administrative claimant other than a trustee may have standing to recover pursuant to § 506(c), particularly when no other party has an economic incentive to seek recovery on behalf of the claimant. *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 93–94 (3d Cir.1986).

Recovery pursuant to § 506(c) is permitted only where: (1) the expenditure was reasonable and necessary for the preservation or disposal of the property; and (2) the expenditure provided a direct benefit to the creditor having a perfected security interest in the property. *In re CS Associates*, 29 F.3d 903, 906 (3d Cir.1994). The burden of proving entitlement to recoup costs and expenses lies with the party seeking to recover under § 506(c). *Flagstaff Food Service*, 739 F.2d at 77.

Should it elect to begin cleaning up the contaminated site, EPA will be entitled to a claim pursuant to § 506(c) for the reasonable costs and expenses it incurs in cleaning up the site. In particular, it will be entitled to utilize the funds remaining in the court's registry account which were realized from the sale of the uncontaminated portion of the property that was subject to EDA's lien.[4]

A trustee who cleans up hazardous waste on property of the bankruptcy estate is discharging a legal obligation of the estate. As § 506(c) makes clear, if the costs so incurred preserve such property and are reasonable and necessary, the costs may be recovered from the property to the extent that a creditor having a security interest in the property has benefitted. *See In re Better–Brite Plating*, 105 B.R. at 918.

By cleaning up the site, EPA "stands in the trustee's shoes" in preserving the estate. *See In re Mowbray Engineering*, 67 B.R. at 35. EPA accordingly is entitled, as the trustee would be pursuant to § 506(c), to recover its costs from the property prior to payment of any secured claims against it. *In re Better–Brite Plating*, 105 B.R. at 918.

EPA's efforts in cleaning up the property unquestionably will confer a direct benefit upon EDA. Due to the presence of hazardous wastes and radioactive contamination at the site, the remainder of debtor's real property is unmarketable and has no economic value. If and when the property becomes marketable as a result of the action taken by EPA, EDA would enjoy a windfall unless it

---

4. Although EPA has indicated that it expects to begin cleaning up the site in the very near future, there is no certainty that it will do so. We previously urged EPA to begin cleaning up the site and directed the trustee to do so if EPA does

not. Our statement that EPA will have an administrative claim against all funds remaining in the court's registry account shall apply to the trustee if he has to commence cleaning up the site.

reimburses EPA for its costs and expenses in cleaning up the site.[5]

In addition to urging EPA to begin the initial phase of the project to clean up the site, we strongly urge EPA to undertake the second phase as soon as is practicable. It is not known at this time, however, whether estate funds presently in the court's registry account will suffice to pay the entire cost of cleaning up the site. Although we were informed that the first phase of EPA's cleanup will cost approximately two hundred and fifty thousand dollars ($250,000.00), it is not known how much the second, and apparently more difficult, phase will cost. We suspect that it will cost more than the first phase.

If the cost of the second phase is one million dollars or less, estate funds presently in the court's registry account could suffice to pay all cleanup costs. But if the cost of both phases of the project exceeds one million three hundred thousand dollars ($1,300,-000.00), estate funds in the court's registry account will not suffice.

Should this latter eventually occur, we would be inclined to look favorably upon a request by EPA (or the trustee, if he has to clean up the site) to grant it an administrative claim against estate funds previously distributed to EDA *and to any other **creditors*** and to direct them to disgorge funds previously received to help pay remediation costs. The conclusion that EPA (or the trustee) would be entitled to an administrative claim against funds remaining in the court's registry account would appear to apply *pari ratione* to estate funds precipitously distributed to creditors earlier in these cases.

In addition to seeking in his omnibus motion to abandon the above property, the trustee also requests authorization to pay the chapter 7 and chapter 11 trustees and their counsel; to disburse the balance of the funds in the court's registry account to EDA; and to finally close the case. These latter requests are premature in light of the determination that the trustee may not abandon the property and therefore shall be denied at this time.

## ORDER OF COURT

**AND NOW** at Pittsburgh this 1st day of July, 1996, in accordance with the accompanying Memorandum Opinion, it hereby is **ORDERED, ADJUDGED** and **DECREED** as follows:

(1) EPA is directed to begin forthwith cleaning up site. In the event this court lacks authority to direct it to take such action, we strongly urge it to do so immediately. Should EPA not do so, the chapter 7 trustee shall promptly request permission of this court to begin cleaning up the site.

(2) The cost of the cleaning up the site shall be granted an administrative priority pursuant to 11 U.S.C. § 506(c) and shall be paid from funds remaining in the court's registry account. If said funds are not sufficient to pay all cleanup costs, we will consider at a later time a motion to grant EPA an administrative claim pursuant to 11 U.S.C. § 506(c) against estate funds previously distributed to EDA and to other creditors and to direct said creditors to disgorge said funds.

(3) The trustee's omnibus motion to abandon real property, to distribute funds remaining in the bankruptcy estate, and to close the case is **DENIED.**

IT IS SO **ORDERED.**

5. The discerning reader might think it odd to conclude that EDA, an agency of the federal government, would enjoy an unfair windfall unless EDA reimburses EPA, another agency of the federal government, for the costs and expenses EPA incurs in cleaning up the site subject to EDA's security interest. We would not disagree with their assessment. However, we are constrained to employ such tortured, convoluted reasoning because, until very recently, different federal agencies refused to speak with a single voice and instead have elected to further their own parochial agendas.