USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-1819 RICHARD M. GALLIVAN AND EDWARD T. SMITH, JR., Appellants, v. SPRINGFIELD POST ROAD CORPORATION, ET AL., Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel M. Gorton, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____ ____________________ Claudia J. Reed with whom David J. Noonan was on brief for _______________ _______________ appellants. Richard L. Neumeier for appellees. ___________________ ____________________ April 7, 1997 ____________________ COFFIN, Senior Circuit Judge. This appeal is from a ______________________ district court judgment approving a bankruptcy judge's orders denying motions of appellant real estate brokers Gallivan and Smith (1) to compel the payment of a brokerage fee by appellees, the debtors-in-possession in Chapter 11 proceedings, as administrative expenses under 11 U.S.C. 503(b);1 and (2) to recover from a secured party, MBL Life Assurance Corporation, their respective shares of the brokerage fee, under 11 U.S.C. 506(c), as a "reasonable, necessary cost[] of preserving" debtors' property.2 The district court denied both motions, holding that neither cited provision gave appellants a priority claim but only the status of an unsecured creditor. We agree. Findings and Conclusions Below The findings of fact of the bankruptcy court, affirmed by the district court, are the following. One of the debtors,  ____________________ 1 Section 503(b) provides, in relevant part: (b) After notice and a hearing, there shall be allowed, administrative expenses ..., including - (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after commencement of the case .... 2 Section 506(c) provides, in relevant part: [T]he trustee may recover from property secured as an allowable claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim. Appellants also sought recovery under a restitution theory. -2- Springfield Post Road Corp., owned land constituting part of a strip type shopping mall in Springfield, Massachusetts. The remaining portion was leased under a ground lease to the other debtor, Route 20-21 Associates, Inc. The president of both debtors was Melvin Getlan. In the spring of 1991 Getlan asked Gallivan, a real estate broker specializing in finding national restaurant chains as buyers or lessees of property, to obtain a tenant for one of the mall's buildings. Getlan agreed to pay a commission of seven percent of gross rental for years one through ten of any lease, payable on the commencement of construction. Through Smith, another broker with experience in finding restaurant chains, Gallivan pursued The Olive Garden, a restaurant chain operating as a division of General Mills Restaurants, Inc. Gallivan and Smith agreed on an even split of the commission. After two years, a lease was signed by debtors on May 17, 1993 and by General Mills on June 17, 1993. The lease envisaged the razing of the existing building and the construction of a new one. The lease was to commence after General Mills gave notice that all conditions had been met or waived. Conditions included issuance of a liquor license and building permit, approval of a site plan by Marshall's, the debtors' largest tenant, and the execution of nondisturbance agreements by prior mortgagees. The seven percent brokerage commission came to $66,780. On June 25, 1993 the debtors filed petitions under Chapter 11 and continued in possession. Smith and Gallivan, although claiming to have -3- worked seventy or eighty hours on lease-associated matters after the filing of the petitions, were found to have "devoted perhaps twenty-five hours" post petition, primarily to obtaining approval of the site plan. Several months after filing, construction of the new building commenced. The most critical findings were that, under the oral brokerage agreement, "the commission was to be earned when the lease was signed and was to become payable when construction commenced;" and that whatever services were performed by appellants after the Chapter 11 petitions were filed were gratuitous and not required by their agreement, but were rendered in their own interest to "facilitate consummation of the transaction."  The court held, with respect to the claim under 503(b), that, since appellants' post-petition services were not required by the brokerage agreement, they were not "actual, necessary costs" of preserving the estate or "commissions for services rendered after the commencement of the case." The same fact findings dictated an alternate conclusion, that the contract between the debtors and plaintiffs could not be viewed as an executory contract at the time of filing, which could later be assumed by the estate. The court cited four grounds in support of its refusal to apply 506(c): (1) that the statute contemplates only required post-petition services; (2) that plaintiffs lacked standing, since the statute specifies only that "The trustee may recover . _______ -4- . ." (emphasis added), and no special circumstances existed, such as was the case in In re Parque Forestal, Inc., 949 F.2d 504, 511 ___________________________ (1st Cir. 1991);3 (3) that the direct and intended beneficiaries of any services were the debtors, not the secured party; and (4) that any services rendered by appellants merely "enhanced, rather than preserved" the collateral secured. The court did not reach or deal with the debtors' alternative claim for restitution, since this depended on the prior existence of an executory agreement, which the court had rejected. Discussion Before commencing our analysis, we think it is useful to place appellants' claims in perspective. The issue is not one which should be viewed in isolation, outside of the established metes and bounds of bankruptcy law. That is, it is beside the point to consider whether able, persistent, resourceful real estate brokers, who not only found a ready, willing, and able lessee, but worked to assure the satisfaction of a number of conditions of the lease, are entitled to their commission. Rather, we are dealing with a debt owed by an estate within the realm of bankruptcy, with its various rules to assist in making the least unfair allocation of inadequate resources among contesting creditors. The precise question is whether the post-  ____________________ 3 In In re Parque Forestal, 949 F.2d 504, 511-12 (1st _____________________ Cir. 1991), we agreed with two other circuits that third parties may recover where they have equitably come to stand in the trustees' shoes, especially where a colorable claim exists and where a third party is the only one likely to pursue it.  -5- petition services of these appellants were so bargained for or so crucially indispensable as to elevate what would otherwise be an unsecured claim to a priority claim that must be paid before those of other unpaid pre-petition suppliers of goods and services. We begin our analysis by addressing appellants' legal proposition having to do with our standard of review. They contend that whether or not post-filing performance was required of the brokers is not only a question of law, but of state (Massachusetts) law. Appellants cite such cases as Bennett v. ___________ McCabe, 808 F.2d 178 (1st Cir. 1987) and Tristram's Landing, Inc. ______ ________________________ v. Wait, 367 Mass. 622 (1975) for the proposition that real ________ estate brokers earn their commissions, absent breach of contract by their principals, when the transaction has been completed, not when the purchase and sale (or lease) agreement is executed. This proposition, say appellants, is binding on the bankruptcy court, forecloses any fact finding, is reviewable de novo, and __ ____ warrants reversal of the judgment below. We disagree. Appellants, it seems to us, have misconceived the thrust of the authorities cited, as well as the source of governing law. In Bennett we were addressing the sole question _______ whether, under current Massachusetts law, an unintended, innocent seller's default resulting in the frustration of a transaction would justify the seller's refusal to honor an agreed upon broker's commission. Bennett, 808 F.2d at 179-80. Tristram's _______ __________ Landing announced the basic proposition that when a commission is _______ -6- payable "on the sale," a broker is not entitled to a commission until the transaction is completed. Tristram's Landing, 367 __________________ Mass. at 626. But there the court made very clear that it was not defining an obligation of the broker, but rather was dealing with a special agreement or circumstance "wherein consummation of the sale became a condition precedent for the broker to earn his commission." Id. at 627.  __ This difference was explicitly recognized in In re Munple, _____________ Ltd., 868 F.2d 1129, 1130-31 (9th Cir. 1989), where a purchase ____ and sale agreement provided that a broker's commission was to be payable "at the close of escrow." The conclusion of the deal was delayed by a dispute between seller and buyer. The seller then filed under Chapter 11; the two parties finally composed their differences and the seller then sought to assume the purchase agreement free and clear of the broker's claim for commission. The broker argued that the agreement was executory, and thus had been assumed by the estate because payment was contingent on the closing of the sale. The Court of Appeals observed: This argument confuses performance obligations and conditions precedent. . . . The condition precedent to [seller's] obligation to pay the commission imposed no further obligations on [broker], nonperformance of which would have excused [seller] from paying the commission. Because [broker] had done everything required of it to earn the commission, the commission provision in the purchase agreement was not executory. We therefore do not agree that these cases support appellants' claims. Moreover, the governing statute in this case is 11 U.S.C. 503(b). Its requirements are to be assessed under federal law. -7- In re Munple, Ltd., 868 F.2d at 1130. As we have held in In re __________________ _____ Mammoth Mart, Inc., 536 F.2d 950, 954 (1st Cir. 1976) with ___________________ reference to the predecessor of 503(b),  It is . . . clear that a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt after the filing. What is not foreclosed under 503(b) is an executory contract, which may be assumed by the debtor. Federal courts have pretty generally settled upon the following definition of an executory contract: "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." In re Columbia Gas System Inc., 50 F.3d 233, 239 (3d ________________________________ Cir. 1995)(citation omitted).  We therefore proceed with our review for clear error of the bankruptcy court's finding that the brokers' bargained-for work had been done as of the filing of the petitions and that subsequent efforts were gratuitous. Gallivan's testimony was that not only was the fee set at seven percent, but that in dealing with ground leases (leases where a tenant must construct his own improvement on the land leased), "There are a number of conditions that a broker has to perform . . . . [s]uch as site plan, hazardous waste, in this case nondisturbance, liquor licenses." A broker is, he further testified, entitled to a ground lease commission "normally" upon -8- the initiating of construction, when all the conditions have been met. Later, when he told Smith of the terms of the agreement, he referred to the "payable upon construction" term, saying, "[H]e and I have done a number of restaurant deals and that's fairly common in our industry." He said that Getlan had indicated his agreement to a seven percent fee, payable on construction. No specific conditions were identified as having been discussed. The lease itself, signed well after the discussions, contained some dozen conditions, some requiring action from the landlord, some from the tenant.  Getlan testified that he had never accepted a letter of agreement that the brokers had prepared. He even denied that he had agreed on the fee and time of payment; on these points the court found against him. He said he normally did not settle on commission details before he had a live tenant before him, and that every deal was different. As for discussing services in addition to finding a tenant, Getlan acknowledged that it was normal for brokers to do what they could in their own best interest. He, however, thought that The Olive Garden chain had their own resources. When asked if he discussed with Gallivan help in getting other approvals, he said: THE WITNESS: He volunteered to help, if necessary, with the building department to get any permits or find out what was needed or what. He volunteered for that and I assume he did whatever he was asked to do by them or he may have done something on his own, I don't know. THE COURT: Did you ask him to do anything. . . ? -9- THE WITNESS: I don't think I asked him to do anything personally. On this record, we cannot find clear error in the court's determination that appellants had earned their commission in the sense that they had done all that they were obligated to do prior to the debtors' filing and that their further efforts were gratuitous. We have already noted Getlan's comments with regard to any work done in pursuing various governmental permits, such as liquor licenses. The major efforts, according to the court, were directed toward obtaining the approval of Marshalls to the site plan. Here, the court could reasonably find that the basic approval had been given before execution of the lease and that the delay in getting written approval of details long settled was occasioned by a complete change of staff in the relevant office of Marshalls. Similarly, Getlan performed whatever work was necessary to get the mortgagees to execute nondisturbance agreements, insofar as the mortgagees were involved. Smith's efforts were directed toward persuading the tenant that it could live with what the first mortgagee had insisted on. And there is no evidence that these services, as well as the others, were requested by Getlan. The efforts expended by appellants, post petition, are reminiscent of those of the brokers in In re Munple, Ltd., 868 ___________________ F.2d at 1131: [Broker] contends that the purchase agreement "authorized" it to render such services and gave it a "strong incentive" to help close the deal because payment of the commission was contingent on closing. [Citation omitted.] Even if true, these facts do not -10- render the commission agreement executory on [broker's] part after it had produced the buyer. . . . [T]he critical question is whether [broker] was required to ________ perform such services in order to earn its commission. [Emphasis in original.] In short, we are unable to find clear error in the finding of the bankruptcy court that appellants had completed their services under the contract before the filing date. This also means that, as of the filing date, the brokerage contract was not executory and could not be assumed by the debtor. As the Third Circuit has commented, in a similar situation, In cases where the nonbankrupt party has fully performed, it makes no sense to talk about assumption or rejection. . . . Rejection is meaningless in this context, and assumption would be of no benefit to the estate, serving only to convert the nonbankrupt's claim into a first priority expense of the state at the expense of the other creditors. [Citation omitted.] In __ re Columbia Gas System, Inc., 50 F.3d at 239. ____________________________ The claim under 503(b) was, therefore, properly denied. We address briefly the claim under 506(c). Without reaching other grounds relied on by the lower courts, we think it sufficient to hold that the finding that the direct and intended beneficiaries of appellants' services was the debtor, and not the secured party, was supported by the evidence. The mere fact that revenues from the lease would help the debtors to meet mortgage payments due MBL does not suffice to carry appellants' burden. See In re Visual Industries, Inc., 57 F.3d 321, 327 (3d Cir. ___ _______________________________ 1995) (mere fact that raw material furnished to debtor by trade creditor assists debtor in continuing operation, and thereby allows debtor to reduce indebtedness to secured creditor, does -11- not entitle trade creditor to reimbursement from collateral of secured creditor.) Collier, after noting that recent circuit court authority, including our own In re Parque Forestal, Inc., 949 F.2d 504 (1st ___________________________ Cir. 1991), would allow standing in some instances to third parties, with lower courts being divided, concludes: The better view is that a secured creditor who received a direct benefit from the rendition of services of the provision of goods [or services] by an administrative claimant should have the collateral charged for that benefit and that the claimant should have standing to seek to charge the collateral for the benefit received. The burden of proof is on the party seeking the recovery to demonstrate the existence and amount of the benefit. 2 Collier _______ Bankruptcy Manual 506.05, at 506-38 (Lawrence P. King, ed., _________________ 3d ed. 1996). Even assuming this were a proper case in which to recognize third party standing, appellants on this record have not carried their burden of establishing the existence and amount of the benefit to MBL. Finally, the bankruptcy and district courts did not err in not addressing appellants' claim for restitution. Affirmed. ________ -12-