

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-9-1995

# InRe:Visual Industries,Inc

Precedential or Non-Precedential:

Docket 94-5676

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"InRe:Visual Industries,Inc" (1995). *1995 Decisions.* Paper 162.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/162

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

----------

No. 94-5676

----------

IN RE:  VISUAL INDUSTRIES, INC., a Delaware Corporation
STACOR CORPORATION, a New Jersey Corporation,

Debtors


PRECISION STEEL SHEARING, INC.

Appellant

v.

FREMONT FINANCIAL CORPORATION

Appellee
----------

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 94-03414)

----------

Argued Tuesday, May 16, 1995

BEFORE:  COWEN, LEWIS and GARTH, <u>Circuit</u> <u>Judges</u>

----------

(Opinion filed June 9, 1995)

----------


Michael B. Kaplan  (Argued)
Stern, Lavinthal, Norgaard & Daly
184 Grand Avenue
Englewood, New Jersey 07631

Attorney for Appellant

Joel R. Glucksman (Argued)
Tod S. Chasin
Friedman Siegelbaum
7 Becker Farm Road
Roseland, New Jersey 07068

Attorneys for Appellee

----------

OPINION OF THE COURT

----------

GARTH, Circuit Judge:

The Bankruptcy Code in § 506(c) provides that a secured creditor may be charged for expenses incurred by another in preserving or disposing of the secured property. 11 U.S.C. § 506(c). The question that is presented on this appeal and which we must answer is: "Does 11 U.S.C. § 506(c) authorize payment to trade creditors who furnish raw materials to a Chapter 11 debtor thereby maintaining the debtor's operation, where the materials supplied did not directly benefit the secured creditor's property?" Our answer to that question is "no" -- § 506(c) does not extend to such a circumstance.

I.

Visual Industries Inc. and Stacor Corporation (collectively, "Visual") were manufacturers of office furniture. In the course of its operation, Visual purchased cut steel from plaintiff-appellant Precision Steel Shearing, Inc.

On August 14, 1992, (the "petition date"), Visual filed a voluntary petition with the bankruptcy court in the District of New Jersey pursuant to Chapter 11 of the Bankruptcy Code.[1]

Defendant-appellee Fremont Financial Corporation was Visual's primary pre-petition secured creditor and held extensive security interests in Visual's assets, including liens on, inter alia, inventory, raw materials, machinery, equipment, furniture, fixtures, instruments, chattel paper, general intangibles, other personalty, and the products and proceeds of all of the foregoing. App. 241. As of the petition date, Visual was indebted to Fremont in the amount of $1,946,605.90 plus costs, expenses and attorneys' fees.

In addition to Fremont's pre-petition security interest, on August 31, 1992, the bankruptcy court entered an "Amended Consent Order Authorizing the Temporary Use of Cash Collateral and Approving Post-Petition Financing" (the "Financing Order") granting Fremont "cash collateral" in, and liens on, essentially all of Visual's personalty and proceeds.[2] The Order also permitted Visual to make continued use of Fremont's pre-

---

[1]. On August 20, 1992 the Bankruptcy Court entered an order authorizing the joint administration of these cases pursuant to Fed. R. Bankr. 1015.

[2]. The Bankruptcy Code, as amended in 1994, defines cash collateral in relevant part as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property subject to a security interest . . . whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a).

petition cash collateral and provided for additional post-petition financing of Visual's operations by Fremont. App. 247.[3]

Fremont's post-petition financing enabled Visual to continue in operation for almost a year, during which time it produced sufficient revenues to reduce its obligations to Fremont by roughly $900,000 to $1,004,740.

During this time Precision continued to supply cut steel to Visual. Precision and Visual arranged a payment system whereby Precision would ship the steel to Visual upon receipt of a telefax copy of a check to be sent by overnight mail. The checks were post-dated and made payable forty-five to sixty days after the shipment had been made. No order of the bankruptcy court either authorized or directed such an arrangement.

---

[3]. In addition to the other protections afforded Fremont's interests, the Financing Order specified that Fremont's secured claim would be treated as an allowed administrative expense claim with priority over, inter alia, "administrative expenses of the kind specified in or ordered pursuant to Section[]. . . 506(c) . . . of the Code," App. 179, and further provided that:

> Anything to the contrary notwithstanding, any and all costs and expenses of the preservation and/or disposition of assets of the Debtors against which [Fremont] holds liens or mortgage, or which are otherwise chargeable to Fremont pursuant to Section 506(c) of the Code, shall not be chargeable to and/or against Fremont by any person or governmental unit.

App. 180-181. Fremont in part relies on these references to § 506(c) to support its argument that no claim under § 506(c) can be made. Precision points out that it was not a party to the Order and hence is not precluded from making the present § 506(c) claim.

We do not rely on this provision of the Order in our disposition of this appeal.

Visual's checks began to be returned for insufficient funds in June of 1993, and shortly thereafter Visual ceased business, owing Precision $94,414.90 for post-petition steel deliveries. On September 7, 1993, Visual's Chapter 11 reorganization was converted into a Chapter 7 liquidation proceeding.

On May 10, 1994, Precision filed a motion with the bankruptcy court pursuant to § 506(c) of the Code seeking to compel payment of unpaid post-petition cut steel invoices by surcharging Fremont's collateral. The bankruptcy court denied Precision's motion on June 20, 1994, on the ground that under § 506(c) Precision's furnishing of cut steel to Visual did not directly benefit the property securing Fremont's loan to Visual.

Precision appealed to the United States District Court for the District of New Jersey, which affirmed the decision of the bankruptcy court on September 26, 1994. The District Court recognized that a direct or express benefit to the secured creditor had to be shown, and agreed with the bankruptcy court that the sales of raw material to Visual did not operate to directly preserve or dispose of Fremont's collateral. Hence, the District Court affirmed the bankruptcy court's decision. This appeal followed. Our jurisdiction rests on 28 U.S.C. § 158(d). We affirm.

## II.

This Court's standard of review is clearly erroneous as to findings of fact by the bankruptcy court, and plenary as to conclusions of law. In re Stendardo, 991 F.2d 1089, 1094 (3d Cir. 1993) (citation omitted). Because the district court sits as an appellate court in bankruptcy cases, our review of the district court's decision is plenary. Id. The issue in the present appeal is whether the district court correctly interpreted and applied the legal standard of § 506(c) to the undisputed facts. We therefore exercise plenary review. In re C.S. Associates, 29 F.3d 903, 905 (3d Cir. 1994).

## III.

To answer the question we posited at the outset of this opinion, our analysis starts with the common law that led to the present bankruptcy statute, 11 U.S.C. § 506(c). We then examine In re McKeesport Steel Castings Co., 799 F.2d 91 (3d Cir. 1986) and In re C.S. Associates, 29 F.3d 903 (3d Cir. 1994), the most recent opinions of this Court addressing § 506(c) in any detail.

The general rule is that post-petition administrative expenses[4] and the general costs of reorganization ordinarily may not be charged to or against secured collateral. General

---

[4]. Administrative expenses include: "the actual, necessary costs and expenses of preserving the estate"; certain taxes, fines and penalties; and compensation and reimbursement for a limited range of services. See 11 U.S.C.A. § 503(b) (West 1993).

Electric Credit Corporation v. Levin & Weintraub (In re Flagstaff Foodservice Corp.), 739 F.2d 73, 76 (2d Cir. 1984). Rather, such expenses are normally chargeable only against the unburdened assets of the estate, 11 U.S.C. § 503, thus preserving for secured creditors the collateral securing the debtor's obligations.

However, at common law the general rule was disregarded when a debtor, debtor in possession or trustee had expended funds to preserve or dispose of the very property (collateral) securing the debt. See generally 3 Collier on Bankruptcy ¶ 506.06 (Lawrence P. King, et al. eds., 15th ed. 1994) (tracing historical evolution of the rule) (hereinafter "Collier on Bankruptcy"). Classic examples of compensable expenditures under this exception include storage costs when the secured creditor's collateral was warehoused, or auction costs incurred on the sale of the creditor's collateral. In re Myers, 24 F.2d 349, 351 (2d Cir. 1928) (preservation of the estate's property); Miners Savings Bank v. Joyce, 97 F.2d 973, 977 (3d Cir. 1938) (costs of sale).

Collier on Bankruptcy contains a detailed list of the types of costs and expenses that would generally be found to relate to the preservation or disposition of the subject property and benefit the holder of the security interest. This list includes: appraisal fees, auctioneer fees, advertising costs, moving expenses, storage charges, payroll of employees directly and solely involved with the disposition of the subject property, maintenance and repair costs, and marketing costs. Id. at

506.56-57. All of these expenditures share a common characteristic: they are expenses directly related to disposing of or preserving the creditor's collateral.

Thus, when such expenditures inured to the direct benefit of the secured creditor by preserving or disposing of the subject property, the common law permitted recovery by the claimant on the theory that the creditor whose collateral had been preserved or disposed of for the benefit of the secured creditor, would be unjustly enriched at the expense of the claimant. Collier on Bankruptcy at 506.06.

In 1978, this exception was codified at section 506(c) of Chapter 11 of the Bankruptcy Code, which provides as follows:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Congress' intent in enacting § 506(c) was to assure that when a claimant "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral, the . . . debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party." 124 Cong. Rec. 32,398 (cum. ed. Sept. 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S. Code Cong. & Admin. News 6451. Thus, like the equitable common law rule which preceded it, § 506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant. IRS v.

Boatmen's First Nat'l Bank of Kan. City, 5 F.3d 1157, 1159 (8th Cir. 1993). The rule understandably shifts to the secured party, who has benefitted from the claimant's expenditure, the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate, providing that such unencumbered assets exist. Failing that, the costs of preserving the security for the secured party's benefit would otherwise fall on the warehouseman, auctioneer, appraiser, etc.

Although § 506(c) in terms refers only to recovery by the trustee, we, like many other courts, have held that administrative claimants other than trustees have standing to recover under § 506(c), particularly when no other party has an economic incentive to seek recovery on the claimant's behalf. In re McKeesport Steel Castings Co., 799 F.2d 91, 93-94 (3d Cir. 1986); accord Collier on Bankruptcy, supra, at 506-58 n.7a (while authorities are contradictory, the better position is to allow an administrative claimant to assert its claim under § 506(c)).

The circumstances under which a claimant may rely on § 506(c) are, as we have pointed out, sharply limited. In C.S. Associates we said:

> Our decisions have clarified that to recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditors. Equibank, 884 F.2d at 84, 86-87; In re McKeesport Steel Castings Co., 799 F.2d 91, 94-95 (3d Cir. 1986); see also In re Glasply Marine Indus., 971 F.2d 391, 394 (9th Cir. 1992) ("[T]o satisfy the

> benefits prong [of § 506(c) the claimant]
> must establish in quantifiable terms that it
> expended funds directly to protect and
> preserve the collateral." (internal
> quotation marks omitted)); In re Flagstaff
> Foodservice Corp., 762 F.2d 10, 12 (2d Cir.
> 1985) ("[T]o warrant [§] 506(c) recovery
> . . . [the claimant] must show that . . .
> funds were expended primarily for the benefit
> of the creditor and that the creditor
> directly benefitted from the expenditure.").

C.S. Associates, 29 F.3d at 906 (emphasis in the original). The bankruptcy court and the district court concluded that Precision's sales of raw material to Visual did not operate directly to preserve or dispose of Fremont's collateral and hence Precision had not demonstrated a direct benefit to Fremont, as it is required to do under C.S. Associates. Dist. Ct. Op. 10–11.

Precision nevertheless contends that as a supplier of raw materials it helped "preserve" Visual as a going concern, and that by continuing in operation Visual was enabled to pay back a substantial portion of its debts to Fremont. Therefore, claims Precision, Fremont benefitted from Precision's post–petition dealings with Visual. As a result, Precision argues, Fremont's collateral is chargeable by Precision under § 506(c). We cannot agree. We do not interpret § 506(c) or understand our precedents interpreting § 506(c) to protect ordinary trade creditors such as Precision.

Nor is our analysis altered by Precision's argument that it helped maintain Visual as a "going concern." Precision voluntarily continued to deal with Visual, presumably with the hope of turning a profit. There is no reason to believe that

Congress intended to afford the same special protection for trade creditors who furnish materials to a Chapter 11 debtor as it did for claimants who preserve or dispose of secured assets. The benefit provided by Precision's supply of raw materials was not directed towards preserving or disposing of Fremont's cash collateral. Accordingly, Precision's reliance on § 506(c) is misplaced.

IV.

Precision, in petitioning for payment from Fremont's cash collateral, relies on In Re McKeesport Steel Castings Co., 799 F.2d 91 (3d Cir. 1986). McKeesport upheld a claim by a utility, Equitable Gas, which had supplied natural gas to the debtor manufacturer, McKeesport, while McKeesport was undergoing Chapter 11 reorganization. McKeesport's largest creditor, Equibank, whose loans were secured by liens on McKeesport's inventory, accounts receivable, real property, fixtures and equipment, challenged the payment to Equitable Gas for its post-petition gas service.

Relying on three different theories, one of which contended that Equitable Gas had preserved the lienholder's collateral under § 506(c), the utility sought to charge the collateral securing Equibank's interest for unpaid post-petition utility bills. Equitable Gas also relied on its superpriority status granted by a consent order entered by the bankruptcy

court,[5] and on 11 U.S.C. § 366(b), which provides that a utility may discontinue services if it is not furnished "adequate assurance" of payment.[6]

The bankruptcy court had authorized, by order, payment out of Equibank's cash collateral for Equitable Gas's post-petition gas services. However, despite a payment time table set by the bankruptcy court, McKeesport regularly failed to meet its obligations to Equitable Gas.

On two different occasions, Equitable Gas had attempted to discontinue its gas services after McKeesport failed to make timely payments. Each time, the bankruptcy court entered orders denying Equitable Gas the right to discontinue service, stating that by ordering the continued supply of gas it was seeking to protect the lienholders. On Equitable Gas's third application, however, the bankruptcy court granted its petition for relief and ordered the secured creditors to pay $57,261.16 for post-petition gas service. The district court denied recovery to Equitable Gas, but we reversed the district court's order and affirmed the order of the bankruptcy court.

---

[5]. The Bankruptcy Court by order had permitted McKeesport to use its cash collateral to pay for raw materials, supplies, gas, etc. It had also granted a superpriority to those who provided raw materials, utilities and supplies used in McKeesport's manufacturing process.

[6]. 11 U.S.C. § 366 forbids a utility to discontinue service solely on the basis of the commencement of Chapter 11 proceedings, provided it is furnished with adequate assurance of payment in the form of a deposit or other security.

We acknowledge that in ordering payment to Equitable Gas for providing post-petition gas service, the McKeesport court stated that it was doing so "to preserve the going concern value of the debtor's estate." 799 F.2d at 95. This would appear to lend support to Precision's argument. However, the difference between the circumstances of McKeesport and the circumstance which we face is dramatic. This difference was recognized as well by the bankruptcy court and by the district court.

As we have just recounted, in McKeesport, the bankruptcy court had entered two orders denying Equitable Gas the right to discontinue service. As a result, Equitable Gas, unlike Precision, had no choice as to whether to supply its product to the debtor in possession. Equitable Gas had been directed by the bankruptcy court to continue to provide post-petition gas service.

Moreover, Equitable Gas had still another string to its bow, which Precision does not. While the McKeesport court had no need to rule or rely on Equitable Gas's claim under § 366(b), we cannot ignore the obvious fact that under § 366(b), Equitable Gas was, as a utility, entitled to "adequate assurance" of payment, an assurance not given to Precision.

We do not question that the court's discussion in McKeesport may have inadvertently encouraged trade creditors such as Precision to believe that any materials furnished to a debtor which assisted a debtor's operations -- materials such as raw materials, typewriters, paper clips, pencils, and the like -- constituted a benefit to the debtor and thus could be charged

against a secured lender's collateral.  However, we do not read McKeesport as generously as Precision does.  We believe that the bankruptcy court order obtained by Equitable Gas, the cash collateral order providing for payment to utilities and the presence of § 366 issues all distinguish McKeesport from the situation in which Precision has found itself.

Merely providing some benefit to the debtor, as Precision has provided by supplying Visual with steel, does not satisfy § 506(c)'s requirement that the claimant in order to prevail must provide a direct benefit inuring to the secured lender for the preservation or disposition of the secured property.  Were it otherwise, no secured lender would assist in financing the debtor, because then every trade creditor would in effect have priority over the secured lender.  As the bankruptcy court emphasized, the availability of Chapter 11 financing would be jeopardized if we were to allow any claimant who furnishes any benefit to a secured creditor to claim under § 506(c).  The Court of Appeals for the Fifth Circuit has also recognized that § 506(c) cannot readily be looked to by trade creditors who supply materials to a debtor in Chapter 11, observing that:

> In a reorganization, it is essential that the debtor keep his post-bankruptcy accounts paid, so that tradesmen will have an incentive to deal with the company in Chapter 11.  If this goal is not reached, in many cases Chapter 11 debtors will find it increasingly difficult to maintain operations and to reorganize as going concerns, and the purpose of Chapter 11 would be seriously undermined.  It is equally clear, however, that § 506(c) was not intended as a panacea for this problem.

Matter of P.C., Ltd., 929 F.2d 203, 206 (5th Cir. 1991).

We conclude that McKeesport neither governs nor conflicts with the disposition of this case.

V.

Our most recent instruction respecting § 506(c) appears in C.S. Associates, supra, a decision which followed McKeesport by some eight years and to which we have referred earlier in this opinion. See supra, pp. 9-10. In that case we rejected a claim by a municipality seeking post-petition real estate taxes and water and sewage rents to charge the proceeds of sale of a building under § 506(c). Although the claimant municipality argued that it had "benefitted" the secured party through general municipal services, we held that this "benefit" could not support a claim under § 506(c). Section 506(c) was "designed to extract from a particular asset the cost of preserving or disposing of that asset." 29 F.3d at 907 (quoting In re Parr Meadows Racing Ass'n, 92 B.R. 30, 35 (E.D.N.Y.1988), aff'd in part, rev'd in part on other grounds, 880 F.2d 1540 (2d Cir. 1989)).

Because the city had not demonstrated that the services "actually were performed for the direct benefit of the [secured] property," id. at 908, we denied relief, making clear that expenses incurred by another can be charged against the property securing a secured lender's loan only where, and only to the extent that, the lender has been directly benefitted by the preservation or disposition of property serving as collateral.

VI.

Because Precision had not been specifically ordered by the bankruptcy court to provide steel to Visual, and because Precision has not met the test of § 506(c) mandated by C.S. Associates, we will affirm the district court's order of September 26, 1994, which had denied relief to Precision for the same reasons as had the bankruptcy court.