**In re CONCORD MARKETING, INC., Debtor.**

**No. 98–42097(RG).**

United States Bankruptcy Court, D. New Jersey.

Oct. 12, 2001.

Cole, Schotz, Meisel, Forman & Leonard, P.C., Hackensack, NJ, by Ilana Volkov, for Official Committee of Unsecured Creditors.

Pisarri, McEnroe & Careri, Hackensack, NJ, by William F. McEnroe, for Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen PC, and Arthur Anderson L.L.P., Accountants for Debtor.

Drinker Biddle & Shanley, L.L.P., Princeton, NJ, by David Restaino, Special Litigation Counsel to Debtor.

McCarter & English, L.L.P., Newark, NJ, by Rachel L. Diehl, for Fidelity Funding of California, Inc.

Saiber, Schlesinger, Satz & Goldstein, L.L.C., Newark, NJ, by Vincent F. Papalia, for Dairylea Cooperative, Inc., and North Country Dairy, Inc.

### OPINION

ROSEMARY GAMBARDELLA, Chief Judge.

This matter comes before the Court on the joint motion of the Chapter 7 Debtor and the Official Committee of Unsecured Creditors. This motion is made on behalf of Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, attorneys for the Debtor, Concord Marketing Inc., Arthur Anderson LLP, accountants for the Debtor, Cole, Schotz, Meisel, Forman & Leonard, P.C., counsel for the Official Committee of Unsecured Creditors, Bederson & Company, LLP, accountants for the Official Committee of Unsecured Creditors, and Herbein & Company, Special Accountants to the Official Committee of Unsecured Creditors. Also before the Court is a cross-motion of Drinker Biddle & Shanley, L.L.P., Special Litigation Counsel to the Debtor, (collectively, the "Professionals"). All Professionals seek to surcharge the secured creditors for allowed professional fees and expenses pursuant to 11 *U.S.C.* § 506(c).

Fidelity Funding of California, Inc., Dairylea Cooperative, Inc., and North Coun-

try Dairy, Inc. (collectively, the "Secured Creditors") oppose the motions.

This Court conducted hearings concerning these motions on January 6, 2000, May 24, 2000 and August 10, 2000. The following constitutes this Court's findings of fact and conclusions of law.

## FACTS

### Procedural History

Concord Marketing, Inc. (the "Debtor") was a manufacturer/distributer of cheese products for the private label market. On September 22, 1998, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Code"). On October 2, 1998, the Office of the United States Trustee ("Trustee") appointed an Official Committee of Unsecured Creditors ("Committee"). On November 20, 1998, this Court entered an Order approving the sale (the "Empire Sale") of substantially all of the Debtor's assets to Empire Acquisition Corporation ("Empire"). As of the filing date, the Debtor maintained its operations at three facilities: (1) 8 Empire Boulevard, Moonachie, New Jersey, where its headquarters were located; (2) 11 Empire Boulevard, Moonachie, New Jersey; and (3) 205 Moonachie Road, Moonachie, New Jersey.

Until November 23, 1998, for some sixty-two (62) days after the filing of the Petition, the Debtor operated as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 of the Code. On November 23, 1998, the Empire Sale closed, and the Debtor ceased operating as a going concern. On May 19, 1999, this Court entered an order converting the Chapter 11 case to a Chapter 7 liquidation and the

United States Trustee appointed Andrew I. Radmin, Esq. as the Chapter 7 Trustee.

On October 19, 1999, the Debtor and the Official Committee of Unsecured Creditors, on behalf of the retained professionals, filed a motion pursuant to 11 U.S.C. § 506(c), seeking to surcharge the Secured Creditors for allowed professional fees and administrative expenses. On November 30, 1999, Debtor's special litigation counsel, Drinker, Biddle & Shanley, LLP, joined the Professionals by filing a cross-motion seeking substantially the same relief. The Secured Creditors filed timely objections. This Court conducted hearings on January 6, 2000, May 24, 2000 and August 10, 2000.

On June 26, 2000, this Court entered a scheduling order which directed the parties to address the issue of whether the applicants have standing to make these motions under 11 U.S.C. § 506(c) in light of the United States Supreme Court's decision in *Hartford Underwriters Insurance Company v. Union Planters Bank*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Oral argument on the standing issue was held on August 10, 2000.

### The Secured Creditors

At the time of the Chapter 11 filing, Fidelity Funding of California, Inc. ("Fidelity Funding") was the Debtor's primary secured lender, holding a secured claim, as of the filing date, in the approximate amount of $2.34 million.

North Country Dairy, Inc. ("North Country") and Dairylea Cooperative, Inc. ("Dairylea") were the Debtor's junior secured creditors, with North Country's secured claim stated at approximately $2.66 million, and Dairylea's claim stated at approximately $2.5 million.[1]

---

1. At the time Debtor filed its voluntary petition, Dairylea held a secured claim in the amount of approximately $1.5 million. Post-petition financing raised the secured claim to $2.5 million. Additionally, Dairylea holds an unsecured claim of approximately $6 million.

Fidelity Funding and North Country's security interests and liens were prior to Dairylea's secured claim (collectively, Fidelity Funding, North Country and Dairylea, the "Secured Creditors"). The extent, validity and priority of the secured claims were confirmed in this Court's prior Orders.[2]

**The Empire Sale**

From September 22, 1998 through November 23 of 1998, the Debtor operated as a debtor-in-possession, during which time the Secured Creditors consented to the use of their cash collateral. Additionally, Dairylea agreed to provide milk to the Debtor on a credit basis at a rate of approximately $500,000.00 per week.

During this time, the Debtor and its professionals were negotiating an asset purchase with Empire. The parties anticipated the proceeds from the Empire Sale would be sufficient to pay the Secured Creditors in full, as well as provide a dividend to the unsecured creditors.

Unfortunately, the Empire Sale did not generate enough proceeds to pay even the Secured Creditors in full.[3] Fidelity Funding was paid in full the sum of $2,502,428.78, which included all principal, interest, attorneys' fees and other monies due. North Country's secured claim was satisfied by a payment of $2,666,667.00.

Dairylea was paid approximately $60,000.00 at closing, leaving a balance of more than $1.9 million on its secured claim.[4] The professionals here posit that Diarylea, nonetheless, has recovered more than $500,000 on account of its allowed secured claim from collections of accounts receivable.

**The 506(c) Application**

On May 12, 1999, this Court entered Orders awarding professional fees and expenses as follows: (1) Debtor's attorneys, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen—$113,800.42 (applying the retainer of $57,291.80 towards the award of $171,092.22); (2) Debtor's accountants, Arthur Andersen—$47,602,73; (3) the Committee's counsel, Cole Schotz, Meisel, Forman & Leonard—$59,123.47; (4) the Committee's accountants, Bederson & Co.—$34,898.45; and (5) the Committee's Special Accountants, Herbein & Co.—$15,264. On July 1, 1999, this Court entered an Order awarding Debtor's special litigation counsel, Drinker Biddle & Shanley, $5,287.08.

On October 19, 1999, the Debtor and the Official Committee of Unsecured Creditors, on behalf of the retained Professionals, filed a motion pursuant to 11 *U.S.C.* § 506(c) of the Code, seeking to surcharge the Secured Creditors for professional fees

2. On November 20, 1998, this Court entered orders authorizing the use of cash collateral and settling and resolving objections among the Debtor, Official Committee of Unsecured Creditors, North Country and Dairylea. As part of the settlement Order, North Country agreed to waive secured claims for pre and post-petition interest in the amount of $65,000.00, plus attorneys' fees in the approximate amount of $40,000, in exchange for acknowledgment of the extent, validity and priority of its liens by the Debtor and the Committee.

3. The Empire Sale generated approximately $6 million in net proceeds. The parties had,

at the time of the Court's approval of the sale, anticipated net proceeds of $9.5 million.

4. Dairylea has, and may still, recover some monies through the Debtor's accounts receivable. However, Dairlyea represents that in a best case scenario its remaining collateral will result in gross proceeds of approximately $1.2 million, leaving approximately $700,000 of its secured claim unpaid. The Professionals assert that the collection of accounts receivables were done by the Debtor with the assistance of debtor's attorneys, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen said receivables stated in the amount of $500,000.

and administrative expenses.[5] On November 30, 1999, Drinker, Biddle & Shanley, Debtor's special litigation counsel, joined the Professionals by filing a cross-motion seeking substantially the same relief.

In support of their application, the Debtor's Professionals describe their services as follows:

As more specifically described in the Professionals' respective fee applications, which are incorporated herein by reference, the Debtor's Professionals negotiated an Asset Purchase Agreement ("APA") with Empire which provided for a purchase price of $9.5 million—a price the Debtor believed would be sufficient to pay the Secured Creditors in full and to provide for a distribution to unsecured creditors. Once the Committee was appointed and retained counsel, the Committee's Professionals spent substantial time analyzing the APA and attempting to negotiate with the Debtor's and Empire's counsel certain concerns the Committee had with respect to the

APA which the Committee hoped would generate an even greater return to creditors. It was the Professionals' intention, based on the perceived value of the Debtor's assets and the purchase price in the APA, that after the sale was consummated, the Debtor and Committee would propose a joint plan of liquidation that would provide for a distribution to unsecured creditors.

As specifically delineated in the Professionals' respective Fee Applications, the Professionals were intimately involved in drafting and negotiating the Debtor's use of cash collateral and postpetition financing to preserve the Debtor's ongoing business operations pending consummation of the APA and thereby ensure that the Secured Creditors' collateral would be disposed of in a manner that provided them with the maximum return.

As expressly detailed in the Professionals' respective Fee Applications, the

---

**5.** The Professionals are not seeking the full amount of fees and expenses previously awarded by this Court. The Professionals only seek payment for services rendered which they assert directly preserved and/or disposed of the Debtor's assets for the benefit of the Secured Creditors.

The Professionals assert:

The Court should be aware that the Professionals do *not* seek to be paid from the Secured Creditors the full amount of fees and expenses previously awarded to them pursuant to fee applications. Instead, the Professionals seek to be paid only for those services which were directly aimed at preserving and disposing of the Debtor's assets. To that end, the Professionals have itemized their time entries to reflect those services that relate to preservation and disposition of the Secured Creditors' collateral, and are only seeking payment for those services. (Copies of the Professionals' time entries from their respective fee applications, with the time entries for which payment is sought pursuant to section 506(c) marked accordingly, are annexed hereto as

Exhibits A, B, C, D, and E.) In addition, the Professionals only seek reimbursement for costs in a proportion equal to the proportion of their total fees that are being sought. Because Herbein was retained for the specific purpose of assisting the Committee in valuing the Debtor's business as a going concern, all of its services benefitted the Secured Creditors' collateral. Accordingly, Herbein seeks payment in full of its requested fees.

Thus, the total fees and costs the Professionals request under Section 506(c) is as follows:

| Firm | Requested Fees | Requested Costs |
|---|---|---|
| Cole, Schotz | $ 42,591.50 | $ 5,345.98 |
| Bederson | $ 20,653.30 | $ 259.32 |
| Herbein | $ 15,000.00 | $ 0.00 |
| Ravin, Sarasohn | $101,857.25 | $14,839.41 |
| [Arthur Anderson] | $ 21,819.00 | $ 504.23 |

*See* Reply of Debtor's and Committee's Professionals to Secured Creditors Objections at ¶ 26, ¶ 27 from Application and f.n. 2. (Emphasis in original).

Committee's Professionals also undertook extensive discovery of: (i) the Debtor; (ii) Cognati Cheese Company, Inc. ("Cognati"), a company whose shareholders are married to the Debtor's shareholders and owed the Debtor in excess of $1.0 million in accounts receivable (the "Cognati A/R"); and (iii) RDD Associates, LLC ("RDD"), an insider of the Debtor that was entering into brokerage agreements with Empire as part of the APA. As a result of the Committee's Professionals' efforts in this regard, as well as the extensive negotiations that ensued, the Committee, Cognati and RDD entered into a settlement agreement pursuant to which Cognati agreed to repay the Cognati A/R by April 1, 1999, and Cognati's shareholders, their wives and RDD (the "Guarantors") guaranteed repayment of the Cognati A/R (the "Cognati/RDD Agreement"). Ultimately, Cognati defaulted under the Cognati/RDD Agreement and, after this case was converted to Chapter 7, the Committee assigned its rights under the Cognati/RDD Agreement to North Country and Dairylea for enforcement and collection.

Additionally, as of the Filing Date, the Debtor was engaged in litigation with the Borough of Moonachie regarding the Debtor's dispute of the validity and extent of certain sewer charges assessed by the Borough. The Debtor removed the lawsuit to the United States District Court for the District of New Jersey shortly after the Filing Date, and the lawsuit was subsequently referred to the Bankruptcy Court. The charges in dispute totaled in excess of $1.0 million as of the hearing on approval of the APA.

As a condition to the APA, Empire insisted on operating in the Debtor's 8 Empire Facility for at least six (6) months after the closing on the sale, thereby presumably requiring the Debt-

or to assume the 8 Empire Facility Lease. Because the Debtor's non-payment of the sewer charges constituted a default under the 8 Empire Facility Lease, the Debtor would have to cure the substantial arrearages to the Borough to Moonachie in order to assume the 8 Empire Facility Lease.

From the outset, the Committee objected to the Debtor's assumption of the 8 Empire Facility Lease given the significant default. The committee suggested various alternatives for Empire to operate in the 8 Empire Facility post closing without having to assume the 8 Empire Facility Lease, none of which satisfied the 8 Empire Facility landlord, Alexander Empire Associates ("Alexander"). Moreover, Empire unequivocally stated that unless the 8 Empire Facility Lease was assumed and the arrearages cured by the Debtor's estate, it would refuse to purchase the Debtor's assets. Because no other purchasers came to the table, the Debtor and Committee were left with little negotiating power.

Nevertheless, the Committee and Debtor were determined to settle this dispute. Shortly before the hearing on the sale, counsel for the Committee, the Debtor, the Borough of Moonachie and Alexander met to discuss possible resolutions of the litigation and the Committee's objection to the assumption of the 8 Empire Facility Lease. The extensive negotiations led the Borough of Moonachie to agree to reduce the amount of the assessed sewer charges by almost $300,000.00 and to a delay in payment of a portion of the cure amount until well after the closing on the APA. As a result of the reduction in the Borough of Moonachie's claim, the likelihood that the APA would be approved and the Secured Creditors would be paid was substantially increased.

Although a resolution was reached with the Borough of Moonachie, the Committee's concerns about the source of payment of the arrearages was unresolved. The Committee believed that because Empire was reaping the benefit of the Debtor's assumption of the 8 Empire Facility Lease, it should, at a minimum, share in the payment of the arrearages. The Professionals aggressively negotiated this point with Empire's counsel at the hearing on the motion to approve the APA. The Professionals' negotiations proved successful as Empire agreed to increase the purchase price under the APA, thereby increased the amount of sale proceeds the Secured Creditors would receive at the closing.[6]

At the closing on the sale of assets, Fidelity Funding was paid in full the sum of $2,502,428.78, including all principal, interest, attorneys' fees and other charges. Likewise, North Country's entire secured claim was satisfied in full by the payment of $2,666,667.00. Dairylea, at the closing on account of its allowed secured claim, and thereafter through the date the Debtor's bankruptcy case was converted to a Chapter 7 from the collection of accounts receivable, which was done by the Debtor with the assistance of Ravin, Sarasohn, a sum in excess of $500,000.00.

*See* Application of Debtor's and Committee's Professionals in Support of Motion for Order Surcharging Secured Creditors for Allowed Fees and Expenses Pursuant to 11 U.S.C. § 506(c), ¶¶ 10–18.

In support of its cross-motion for an order surcharging secured creditors, Drinker, Biddle, & Shanley, Special Litiga-

tion Counsel to the Debtor, describes its services in this case as follows:

Pursuant to an Order executed on October 21, 1998, the Debtor was authorized to retain Drinker Biddle as special litigation counsel in connection with the Debtor's claim against the Borough of Moonachie ("Borough") seeking a reduction in outstanding and unpaid sewer assessments. The Order specified that the retention was effective as of the September 22, 1998 petition date.

Drinker Biddle rendered legal services in connection with the prosecution and ultimately favorable resolution of the sewer claim. The Borough's original claim for unpaid assessments dating from the last quarter of 1996, together with interest and penalties, was $1,257,551.26. That claim was eventually settled for a substantially reduced amount by the Debtor's payment of $825,000 (which included a $21,764.96 unpaid real estate tax bill). The settlement of this claim was approved by the Court on November 20, 1998.

As more specifically described in the Certification of David Restaino, and in Drinker Biddle's prior fee application, which is incorporated herein by reference, the Debtor was engaged in litigation with the Borough of Moonachie regarding the Debtor's dispute of the validity and extent of certain sewer charges assessed by the Borough. The Debtor removed the lawsuit to the United States District Court for the District of New Jersey shortly after the Filing Date, and the lawsuit was subsequently referred to the Bankruptcy Court. The charges in dispute totaled in excess of $1.2 million. Absent a resolution of the charges, the matter

---

**6.** According to the Debtor's bankruptcy schedules, the value of the Debtor's assets as of the Filing Date were stated at in excess of

$15 million or more than two times the amount of the secured debt.

would have been tried as an adversarial proceeding at no small cost given the enormity of the taxes and the gravity of the Debtor's constitutional arguments in opposition to the taxes.

Because the Debtor's non-payment of the sewer charges constituted a default under the Debtor's lease, and because the Borough of Moonachie was looking to enforce the tax charges against the Debtor as the operator of the leasehold, the Debtor had to cure the substantial arrearages to the Borough of Moonachie.

After extensive negotiations, the borough of Moonachie agreed to reduce the amount of the assessed sewer charges by over $400,000. As a result of the negotiated reduction in the Borough of Moonachie's claim, the likelihood that the Secured Creditors would be paid was substantially increased because the priority tax liens of the Borough of Moonachie had been resolved.

Upon information and belief, at the closing on the sale of assets, Fidelity Funding was paid in full the sum of $2,502,428.78, including all principal, interest, attorneys' fees and other charges. Likewise, North Country's entire secured claim was satisfied in full by the payment of $2,666,667.00. Dairylea, at the closing on account of its allowed secured claim, received a sum in excess of $500,000.

*See* Application of Debtor's Special Litigation Counsel in Support of Cross–Motion for Order Surcharging Secured Creditors for Allowed Fees and Expenses Pursuant to 11 U.S.C. § 506(c) ¶¶ 2, 3, 8, 9, 10, 11.

The Secured Creditors have filed separate Opposition to the Motions asserting that the Professionals lack standing to bring the motions and, alternatively, that the standards for imposing a surcharge on secured creditors have not been met here as the services were not expended primarily for the benefit of secured creditors and provided no direct benefit to the secured creditors.

### Assignment by the Chapter 7 Trustee

On July 5, 2000, Andrew I. Radmin, the Chapter 7 Trustee, executed an "Assignment of Chapter 7 Trustee's Right, Title and Interest to Pursue Cause of Action Pursuant to 11 U.S.C. § 506(c)". The assignment reads as follows:

"I, Andrew I. Radmin, being the duly appointed and acting Chapter 7 Trustee of Concord Marketing, Inc., do hereby assign to Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C., Cole, Schotz, Meisel, Forman & Leonard, P.A., Arthur Andersen LLP, Bederson & Company, Inc., and Herbein + Co., Inc. (collectively, the 'Professionals'), all of my right, title and interest in and to the pending motion by the Professionals to surcharge Fidelity Funding of California, Inc., North Country Dairy, Inc. and Dairylea Cooperative, Inc. for fees and out-of-pocket disbursements awarded to the Professionals pursuant to 11 U.S.C. § 506(c). Any funds recovered by the Professionals pursuant to this Assignment constitute property of the estate and shall be turned over to me for administration."

The assignment was filed with this Court on July 12, 2000.

### Arguments

This Court conducted hearings concerning these motions on January 6, 2000, May 24, 2000 and August 10, 2000. The August 10, 2000 hearing specifically addressed the issue of § 506(c) standing in light of the United States Supreme Court's decision in *Hartford Underwriters Insurance Company v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000).

In support of their application to surcharge the Secured Creditors, the Professionals argue the Supreme Court's *Hartford* decision allows, under certain circumstances, other parties to proceed in the Trustee or Debtor–in–Possession's stead for § 506(c) purposes. The Secured Creditors assert that the plain language of § 506(c), read in conjunction with the Supreme Court's decision in *Hartford*, does not allow an administrative claimant an independent right to use § 506(c) to seek payment of its claim.

## DISCUSSION

This Court addresses the issue of whether Debtor's Professionals and the Committee's Professionals have standing to seek payment of their claims pursuant to 11 U.S.C. § 506(c), in light of the Supreme Court's decision in *Hartford Underwriters Insurance Company v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000).

### Pre Code Law

The pre-Code Bankruptcy Act provided no authority regarding the surcharge of collateral. However, because it seemed equitable for the secured creditor to "bear the expense of bankruptcy administration which is solely for his benefit, or to which he consents, or which he causes", *In re Louisville Storage Co.*, 21 F.Supp. 897, 899 (W.D.Ky.1936), *aff'd*, 93 F.2d 1008 (6th Cir.1938), the common law developed an exception allowing certain parties to surcharge collateral. Essentially, the common law rule allowed certain parties to surcharge collateral if the expenditure to

be reimbursed directly related to disposing of or preserving the collateral.[7]

### The Statute

In 1978, section 506(c) of Chapter 11 of the Bankruptcy Code codified the common law exception. Section 506(c) states in relevant part:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c)(2001).

The plain language of the statute names only "the trustee" as the party who may recover from secured property, although in a chapter 11 case, a debtor-in-possession has essentially all of the rights, powers and duties as a trustee. *See* 11 U.S.C. § 1107(a). *See also Hartford Underwriters Insurance Company v. Union Planters Bank*, 530 U.S. 1, 120 S.Ct. 1942, 1947 n. 3, 147 L.Ed.2d 1.

### Third Circuit Interpretation

The Third Circuit, in *In re Visual Indus. Inc.*, 57 F.3d 321, 325 (3d Cir.1995), articulated Congress' intent in drafting § 506(c):

> Congress' intent in enacting § 506(c) was to assure that when a claimant "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral, the . . . debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party." 124

---

**7.** *See* 3 *Collier on Bankruptcy*, 506.06 (Lawrence P. King, et al. eds., 15th ed.1994) (tracing the historical evolution of the rule, as well as listing classic, compensable expenditures, such as storage costs, auction costs, and appraisal fees). *See also In re Visual Indus.,*

*Inc.*, 57 F.3d 321 (3rd Cir.1995) (All of these expenditures share a common characteristic: they are expenses directly related to disposing of or preserving the creditor's collateral.) *Id.* at 325.

Con.Rec. 32,398 (cum.Ed. Sept. 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S.Code Cong. & Admin. News 6451. Thus, like the equitable common law rule which preceded it, § 506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant. *IRS v. Boatmen's First Nat'l Bank of Kan. City*, 5 F.3d 1157, 1159 (8th Cir.1993). The rule understandably shifts to the secured party, who has benefitted from the claimant's expenditure, the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate, providing that such unencumbered assets exist. Failing that, the costs of preserving the security for the secured party's benefit would otherwise fall on the warehouseman, auctioneer, appraiser, etc.

*In re Visual Indus.*, 57 F.3d 321, 325 (3rd Cir.1995).

■ The Third Circuit has limited the circumstances under which a claimant may rely on § 506(c). A provider of post-petition goods and/or services to a chapter 11 debtor-in-possession may generally treat their claim as a first priority administrative expense. When the debtor has adequate unencumbered assets in the estate, post-petition providers are granted priority status and are paid first.

The general rule is that post-petition administrative expenses and the general costs of reorganization ordinarily may not be charged to or against secured collateral. Rather, such expenses are normally chargeable only against the unburdened assets of the estate, 11 U.S.C. § 503, thus preserving for secured creditors the collateral securing the debtor's obligations.[8]

*In re Visual Indus., Inc.*, 57 F.3d 321, 324 (3rd Cir.1995); *see also In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 76 (2nd Cir.1984); *In re Parque Forestal, Inc.*, 949 F.2d 504, 511 (1st Cir.1991); *In re Delta Towers Ltd.*, 924 F.2d 74, 76 (5th Cir. 1991); *In re Trim–X, Inc.*, 695 F.2d 296, 301 (7th Cir.1982).

■ To recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditor. *See In re Visual Indus.*, 57 F.3d 321, 324 (3rd Cir.1995); *In re C.S. Associates*, 29 F.3d 903, 906 (3d Cir.1994); *Equibank, N.A. v. Wheeling–Pittsburgh Steel Corp.*, 884 F.2d 80, 84–87 (3d Cir.1989); *In re McKeesport Steel Castings, Co.*, 799 F.2d 91, 94–95 (3d Cir.1986).

Where the debtor's assets are encumbered, the statutory scheme requires the administrative claimant to show how its claim directly benefitted collateral of a secured creditor. *See In re McKeesport Steel Castings Co.*, 799 F.2d 91 (3rd Cir. 1986) (granting § 506(c) standing to a gas company because it "had a colorable claim for expenses and was the only creditor that would zealously pursue that claim.") *Id.* at 94. Upon such showing, the administrative claimant can surcharge the collateral and receive payment pursuant to § 506(c). In *In re C.S. Assocs.*, the Third Circuit noted:

Section 506(c) was not intended to encompass ordinary administrative expenses that are attributable to the general operation and dissolution of an estate in bankruptcy. Rather, it was

---

**8.** Administrative expenses include: the actual, necessary costs and expenses of preserving the estate; certain taxes, fines and penalties; and compensation and reimbursement for a limited range of services. *See* 11 U.S.C. § 503(b).

designed to extract from a particular asset the cost of preserving or disposing of that asset.

*In re C.S. Assocs.,* 29 F.3d 903, 907 (3rd Cir.1994) (holding that City of Philadelphia's claim for postpetition real estate taxes and water/sewer rents not chargeable against a party with a security interest in that real property from the proceeds of a sale because the City did not demonstrate that the taxes conferred a direct benefit to the creditor whose claim the property secured).

The Third Circuit, in certain situations, has granted § 506(c) standing to parties other than the trustee. The rationale behind these decisions is articulated at 3 *Collier on Bankruptcy* ¶ 506.05[8] at 506–142–43 (Lawrence P. King ed., 15th ed.1998):

> The reasoning behind the approach which extends standing to creditors and other claimants is that a secured creditor who received a direct benefit from the rendition of services or provision of goods by an administrative claimant . . ., should have the collateral charged for that benefit, regardless of whether the proceeds of the charge are paid to the trustee in reimbursement for the trustee's prior payment to the claimant, or are paid to the claimant directly. Otherwise, if the trustee has no economic incentive to seek a recovery under section 506(c) with respect to amounts that will be paid over to the claimant. As a result, the secured creditors may obtain a windfall at the expense of the unpaid claimant.

*Id.*

The Third Circuit in *Visual Indus., Inc.* has stated:

Although § 506(c) in terms refers only to recovery by the trustee, we, like many other courts, have held that administrative claimants other than trustees have standing to recover under 506(c), particularly when no other party has an economic incentive to seek recovery on the claimant's behalf. *In re McKeesport Steel Castings Co.,* 799 F.2d 91, 93–94 (3d Cir.1986); accord Collier on Bankruptcy, supra, at 506–58 n. 7a (while authorities are contradictory, the better position is to allow an administrative claimant to assert its claim under § 506(c)).

*Id.* at 325.

### Hartford Underwriters Insurance Company v. Union Planters Bank

In *Hartford Underwriters Insurance Company v. Union Planters Bank,* 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), the United States Supreme Court, in a unanimous decision delivered by Justice Scalia, held "11 U.S.C. § 506(c) does not provide an administrative claimant (of a bankruptcy estate) an independent right to use the section to seek payment of its claim." *Id.,* 120 S.Ct. at 1951.

*Hartford* arose from the bankruptcy proceedings of Hen House Interstate, Inc., a company which at one time operated restaurants, service stations, and an outdoor-advertising firm. *See id.* at 1945. In 1991, Hen House filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Hen House continued business operations and retained possession of its assets as a Chapter 11 debtor-in-possession. *See id.*

Union Planters Bank ("Bank") was Hen House's primary lender.[9] *See id.* At the time Hen House filed its Chapter 11 petition, the Bank held a security interest in

---

9. Union Planters Bank was the successor of Magna Bank; Magna Bank was the successor of Landmark Bank of Illinois. Hen House was originally indebted to Landmark Bank. *See Hartford,* 120 S.Ct. at 1946.

essentially all of Hen House's real and personal property.[10] *See id.* Post-petition, the Bank agreed to lend Hen House an additional $300,000.00 for the purpose of financing the Chapter 11 reorganization. *See id.* at 1945–46. The Bankruptcy Court approved the loan agreement and authorized Hen House to use the proceeds and cash collateral to pay expenses. These expenses included workers' compensation insurance. *See id.* at 1946.

During the post-petition reorganization, Hen House obtained workers' compensation insurance from Hartford Underwriters ("Hartford").[11] *See id.* The policy required monthly premium payments, which Hen House failed to make. *See id.* However, Hartford continued Hen House's insurance coverage. *See id.* Ultimately, the Chapter 11 reorganization failed, and the Bankruptcy Court converted the case to a Chapter 7 liquidation and appointed a trustee. *See Hartford,* 120 S.Ct. at 1946.

Unable to recover from the bankruptcy estate, Hartford attempted to surcharge the secured creditor by filing applications under 11 U.S.C. § 503 and 11 U.S.C. § 506(c). *See id.* The Bankruptcy Court allowed Hartford to surcharge the secured creditor, and the District Court and an Eighth Circuit panel affirmed. *See In re Hen House Interstate, Inc.,* 150 F.3d 868 (C.A.8 1998). However, the Eighth Circuit, sitting *en banc,* reversed, concluding that § 506(c) could not be invoked by an administrative claimant. *See Hartford Underwriters Insurance Company v. Union Planters Bank,* 530 U.S. 1, 120 S.Ct. 1942, 1946, 147 L.Ed.2d 1.

The Supreme Court affirmed, holding "11 U.S.C. § 506(c) does not provide an administrative claimant (of a bankruptcy estate) an independent right to use the section to seek payment of its claim." *Id.,* 120 S.Ct. at 1951.

The Supreme Court noted that Hartford's effort to recover the unpaid premiums involved two provisions, 11 U.S.C. § 503(b) and 506(c). The Supreme Court noted that the parties did not dispute that the cost of the worker's compensation insurance the Debtor purchased from Hartford was an administrative expense within the meaning of § 503(b).[12] *Id.* at 1946.

The Supreme Court noted that secured claims have priority over administrative expenses. *See id. (citing* 11 U.S.C. §§ 506, 725–726, 1129(b)(2)(A)); *see also United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 378–379, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Hartford argued that § 506(c) entitled it to recover from property subject to the Bank's security interest because its furnishing of insurance benefitted the Bank by allowing the continued operation of the Debtor and preservation of collateral or alternatively that such benefit could be presumed from the Bank's consent to the postpetition financing order. These issues were disputed below, but not before the Supreme Court. The Court assumed, for purposes of its decision, that the workers compensation insurance constituted a "benefit to the holder" within the meaning of § 506(c). *Id.,* 120 S.Ct. at 1946–1947.

---

**10.** The secured debt totaled over $4 million.

**11.** Hartford Underwriters had no knowledge of Hen House's bankruptcy proceedings until March 1993, after the reorganization proceeding was converted to a Chapter 7 liquidation.

**12.** Section 503(b) includes as administrative expenses generally entitled to priority over unsecured claims "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b).

The Court analyzed the plain language of § 506(c), focusing specifically on the narrow issue of "whether it is a proper inference that the trustee is the only party empowered to invoke the provision." [13] *Hartford Underwriters Insurance Company v. Union Planters Bank,* 530 U.S. 1, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1.

The Court stated "[w]here a statute . . . names the parties granted [the] right to invoke its provisions . . . such parties *only* may act." *Id. (citing* 2A N. Singer, *Sutherland on Statutory Construction,* § 47.23, p. 217 (5th ed.1992)) (internal quotations omitted) (emphasis added). The Court noted the trustee has a "unique role" in bankruptcy proceedings, making it entirely plausible that Congress meant to provide the trustee a unique and specific power. *See Hartford,* 120 S.Ct. at 1947.

The Supreme Court recognized that Section 506(c)'s provision for the charge of certain administrative expenses against lienholders continues a practice under the Bankruptcy Act of 1898. The Supreme Court also noted that it was the norm that recovery of costs from a secured creditor would be sought by a trustee. *Id.* at 1949. While the Court examined lower court cases in which parties other than the trustee were permitted to pursue such charges under the Act, either simultaneously with the trustee's pursuit of his own expenses or independently, and other decisions allowing individual claimants to seek recovery from secured assets, the Supreme Court concluded that "it is questionable whether these precedents establish a bankruptcy practice sufficiently widespread and well recognized to justify the conclusion of implicit adoption by the Code." *Id.*

The Court further analyzed pre-Code precedent, stating "while pre-Code practice informs our understanding of the language of the Code, it cannot overcome that language." *See id.* at 1949 *(citing Kelly v. Robinson,* 479 U.S. 36, 44, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (internal quotations omitted)).

The Supreme Court determined that because § 506(c) clearly states "[t]he trustee may recover" rather than "[t]here may be recovered," it is sensible to answer the question "who may use the provision" with "only the trustee." *See id.* at 1947. Moreover, the broad phrasing of various sections of the Code, when contrasted with the phrase "the trustee may recover" utilized in § 506(c), supports the conclusion that the trustee is the only entity entitled to use § 506(c). *See id. (citing Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)).[14]

Hartford argued that § 506(c) must be open to nontrustees as in some cases the trustee may lack an incentive to pursue payment and that allowing suits by nontrustees could encourage the provision of postpetition services to debtors on more favorable terms thus furthering bankruptcy goals. *Id.,* 120 S.Ct. at 1950. The Supreme Court stated that while these concerns may be valid, it is far from clear that the policy implications favor Hartford's position. The Court noted that the class of cases in which § 506(c) would be dormant without nontrustee use is limited by the fact that the trustee is obligated to seek recovery whenever his fiduciary

---

**13.** The Supreme court noted that Debtors in Possession may also use section 506(c) as Debtors-in-possession are expressly given the rights and powers of a trustee by 11 U.S.C. § 1107. *See Hartford,* 120 S.Ct. at 1947.

**14.** For example, section 502(a) provides that a claim is allowed unless "a party in interest" objects, and section 503(b)(4) allows "an entity" to file a request for payment of administrative expenses. *See Hartford,* 530 U.S. 1, 120 S.Ct. 1942, 1948, 147 L.Ed.2d 1.

duties require. The Supreme Court also noted that providers of goods and services that benefit secured interests have other means of protecting themselves by insisting on cash payments, contracting directly with the secured creditors or seeking superpriority status under various subsections of § 364. *Id.*

Concluding the analysis, the Court noted that "expanding the number of parties who could use § 506(c) would create the possibility of multiple administrative claimants seeking recovery under the section." *Hartford Underwriters Insurance Company v. Union Planters Bank,* 530 U.S. 1, 120 S.Ct. 1942, 1950, 147 L.Ed.2d 1. Moreover, each such claim would require the bankruptcy court to analyze the necessity of the services and the benefit to the secured creditor. *See id.* Hypothetically, if administrative claimants were allowed to independently seek recovery on their claims, it is possible they could proceed even where the trustee planned to do so. *See id.*

Finally, the Court stated "[i]t suffices that the natural reading of the text produces the result we announce. Achieving a better policy outcome ... is a task for Congress, not the courts." *Id.* (*citing Kawaauhau v. Geiger,* 523 U.S. 57, 64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)).

## ANALYSIS

### Standing

■ The Supreme Court's decision in *Hartford* clearly and unambiguously states "11 U.S.C. § 506(c) does not provide an administrative claimant (of a bankruptcy estate) an independent right to use the section to seek payment of its claim." *Hartford Underwriters Insurance Company v. Union Planters Bank,* 530 U.S. 1, 120 S.Ct. 1942, 1951, 147 L.Ed.2d 1. *Accord In re Debbie Reynolds Hotel & Casi-*

*no Inc.,* 255 F.3d 1061, 1065 (9th Cir.2001) (lender which extended postpetition financing to Chapter 11 debtor on superpriority basis following *Hartford Underwriters* had no standing to seek a surcharge pursuant to § 506(c).)

The Professionals in the first instance seek independent standing to recover under § 506(c), arguing the trustee has no incentive to pursue their claims. The Supreme Court's decision in *Hartford* clearly precludes administrative claimants an independent right to use § 506(c) to seek payment of administrative claims. Here, the Professionals are clearly administrative claimants. The Professionals attempt to distinguish the *Hartford* decision by arguing the Hartford Insurance Company was a vendor providing post-petition services to the Debtor, and not as here Professionals employed by the Debtor and the Creditors Committee under orders and authority of the Court, and as such, the *Hartford* holding is fact specific. This Court is not persuaded by the Professionals argument, as the *Hartford* case makes no distinction between vendors as administrative claimants and court retained professionals as administrative claimants.

### Derivative Standing/Footnote 5

■ Alternatively, the Professionals seek derivative standing based on footnote five in the *Hartford* case. The Professionals argue that the Court should allow the applicants to seek payment in the Debtor's stead, which Debtor has no economic incentive to seek recovery on the claimants' behalf. Alternatively, the Professionals argue that if only the Trustee or Debtor has standing, the Chapter 7 Trustee here has assigned his right to bring these actions to the Professionals themselves. Footnote five of the *Hartford* case states:

We do not address whether a bankruptcy court can allow other interested parties to act in the trustee's stead in pur-

suing recovery under § 506(c). Amici American Insurance Association and National Union Fire Insurance Co. draw our attention to the practice of some courts of allowing creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so, even though the applicable Code provisions, *see* 11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a), mention only the trustee. *See* e.g., *In re Gibson Group, Inc.*, 66 F.3d 1436, 1438 (C.A.6 1995). Whatever the validity of that practice, it has no analogous application here, since petitioner did not ask the trustee to pursue payment under § 506(c) and did not seek permission from the bankruptcy court to take such action in the trustee's stead. Petitioner asserted an independent right to use § 506(c), which is what we reject today. Cf. *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 202–203 (C.A.7 1988) (holding that creditor had no right to bring avoidance action independently, but noting that it might have been able to seek to bring derivative suit).

*Hartford Underwriters Insurance Company v. Union Planters Bank*, 530 U.S. 1, 120 S.Ct. 1942, 1950, 147 L.Ed.2d 1.

This Court will here address the issue of derivative standing discussed by the Supreme Court in footnote five of the *Hartford* decision. Based on the plain language of § 506(c)(read in conjunction with *Hartford*), only the trustee (or debtor-in-possession) has standing to pursue § 506(c) recovery. While the Professionals here have purported to obtain an assignment of the prior Debtor In Possession's and now Chapter 7 trustee's rights to pursue recovery under § 506(c), this Court is convinced that it cannot fairly be said, as noted by the Supreme Court in *Hartford*, that said petitioners "ask[ed] the trustee to pursue payment under § 506(c) and [sought] permission from the bank-

ruptcy court to take such action in the trustee's stead." *Id.* While *Hartford* may not preclude a trustee from seeking § 506(c) recovery on behalf of the Professionals, the purported assignment, which as discussed later in this Opinion this Court finds to be ineffective, does not meet the threshold requirements for derivative standing that the Supreme Court in *Hartford* mandates.

Nor is this defect cured by applicant's request to treat the present motion as both a request for authorization to proceed in the stead of the prior Debtor In Possession and now Chapter 7 trustee and to approve the assignment of the trustee's claims to said Professionals. This Court does not here specifically rule on whether, and under what conditions, a trustee can properly assign his rights under Section 506(c).

## Assignment

In the instant matter, the Professionals failed to obtain from the Court or negotiate with the secured creditors, a "carveout" of monies to pay the subject professional fees. Pursuant to pre-*Hartford* Third Circuit precedent, courts have granted § 506(c) standing to the Professionals under certain limited circumstances. *See In re Visual Indus.*, 57 F.3d 321; *see also In re C.S. Assocs.*, 29 F.3d 903.

 On or about July 5, 2000, Andrew Radmin, the Chapter 7 Trustee, purported to assign the Trustee's § 506(c) rights to the Professionals in an effort to overcome the holdings in *Hartford*. The purported assignment is outside the ordinary course of business as contemplated by the Code, and as such the trustee must, subject to notice and appropriate hearing, seek and obtain court approval for the assignment

to be valid. *See* 11 U.S.C. § 363(b)(1) [15]. However, the trustee has not properly sought this Court's approval. Nor is it procedurally sufficient to simply treat the present surcharge motions as a motion to approve the assignment. Accordingly, as the assignment is procedurally deficient, this Court cannot consider the assignment in support of these motions.

## CONCLUSION

Accordingly, the Professionals' motion, and Drinker Biddle & Shanley's cross-motion to surcharge secured creditors for fees and expenses pursuant to 11 U.S.C. § 506(c) are DENIED.[16]

An order in accordance with this Opinion shall be submitted.

---

**15.** Section 363(b)(1) provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

**16.** By this Opinion, the Court does not rule on any motion that the Trustee may file to approve assignment of any rights he presently holds. Nor does the Court rule on any claims the Trustee may pursue under § 506(c).